UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

RILEY ADONIS POWELL                                                    PLAINTIFF

v.                                   No. 2:23-cv-02085

WESTROCK CP, LLC                                                       DEFENDANT

**<u>OPINION AND ORDER</u>**

Before the Court is Defendant WestRock CP, LLC's ("WestRock") motion (Doc. 33) for

summary judgment, statement of facts (Doc. 35), and brief in support (Doc. 34).  Plaintiff Riley

Adonis Powell responded in opposition (Doc. 42), also filing a brief (Doc. 43) and

counterstatement of facts (Doc. 44).  WestRock replied (Doc. 56).  Mr. Powell also filed a motion

(Doc. 48) to certify a question to the Arkansas Supreme Court, to which WestRock responded in

opposition (Doc. 55).  For the reasons stated below, WestRock's motion will be GRANTED IN

PART AND DENIED IN PART.  Mr. Powell's motion will be DENIED.

I.    **Background**[1]

Riley Powell is an experienced commercial truck driver.  (Doc. 35, p. 1).  In May of 2021,

Powell was employed by Diamondback Services.  *Id.*  Diamondback provided transportation

services to WestRock at WestRock's Fort Smith facility ("the Facility").  *Id.*  On May 17, 2021,

Powell slipped and fell on WestRock's property, resulting in his hospitalization and the present

lawsuit.

To understand the facts of this case and the conditions of Powell's work, it is important to

understand the layout of the Facility's loading area.  The Facility had eight "docks," which are

---

[1] The facts as recounted give Mr. Powell "the 'benefit of all reasonable inferences in the record.'"  *Schottel v. Neb. State Coll. Sys.*, 42 F.4th 976, 981 (8th Cir. 2022) (quotation omitted).

"large doors that trailers get backed up to so that they can be loaded." (Doc. 45-8, p. 22). Drivers backed trailers up to the docks via a "ramp," an inclined parking area. *Id.* Yellow lines are painted on the ramp "to guide the trailers" as they back up to the docks. (Doc. 45-8, p. 29). At any time, five or six Diamondback trailers would be backed up to the Facility's eight docks. (Doc. 45-1, pp. 56–57).

Diamondback had Powell working as a "dedicated driver" for WestRock, hauling pallets of WestRock's cardboard boxes. (Doc. 45-1, pp. 53–54). As a dedicated driver, Powell usually reported to WestRock for work each day and left his tractor parked at the Facility at night. *Id.* at 53. While Powell would occasionally carry out trucking runs for Diamondback on behalf of "another customer that had nothing to do with WestRock[,]" Diamondback would instruct Powell to report back to WestRock afterwards. *Id.*

On most days, a WestRock employee would let Powell know when WestRock would have a load ready for Powell to haul. (Doc. 45-1, pp. 53–54). Powell would then arrive at the specified time and perform a specific series of steps for picking up a trailer. *Id.* at 55. First, Powell would make sure that there were no obstacles or debris behind the truck. *Id.* at 35. Afterwards, as he testified,

> I would back up and get under the trailer. You give a tug to make sure you're hooked. Then I would raise the landing. I would get under and visually make sure the kingpin was locked in place. Then I would come back out, I would hook up my lights and my powerline, and I would charge everything. Then you do a walk-around and you make sure that your lights are working, and you are walking underneath. You get under the tandems and listen for air leaks. You make sure that your brakes are not locked. You are just looking for any kinds of cracks or breaks or anything. . . . Then you come back out, you do a complete walk-around, you check the truck again, and then you can pull forward. Now if it's in a dock, you have to also walk back, pull the chock block out from the tires because they always have them to keep them from rolling. . . . Then you get up, you pull the truck up enough, you go back, you close the doors. . . . [T]hen [you] close it and you go up forward and you're ready to go."

*Id.* at 35–36.   All of these steps are necessary to perform the job; indeed, "[a] full inspection is required by the DOT [Department of Transportation]."   *Id.* at 36, 38.

Powell testified that "with all the loads and the years" of his driving experience with several different employers, he "rarely came across" loading areas "that were really what I would consider not clean." (Doc. 45-1, pp. 49–50).   Typically, such areas "are clean cement or swept cement.  If there was water, it was just water. . . . [M]ost places I ever went just seemed to have clean docks." *Id.* at 50.  This included the loading area of another cardboard plant adjacent to the Facility.  *Id.* at 84–85.  The situation at the Facility's loading area, however, was somewhat messier, as the picture below demonstrates:



(Doc. 33-2)

In this photograph, a sizeable puddle containing mud, debris, and live grass extends into the ramp's parking guidelines for the second and third docks of the Facility.  The puddle covers a

substantial area of the ramp underneath the trailers backed up to both docks, as well as the area of ramp between the two sets of guidelines.

Testimony indicates that this puddle was not a transient phenomenon. Monty Cox, another Diamondback driver working at WestRock, testified that "this picture right here is a common site *[sic]*." (Doc. 45-8, p. 27). Yet another Diamondback driver, Jason Koontz, said that "[t]he little spot has been there for the past 11 years." (Doc. 45-7, p. 35).

Describing the puddle's contents, Powell said:

Some debris gets down in there. It just comes off the pallets or whatever, and it just works its way down. Then the mud and the dirt that would wash in there, their maintenance guy Glen would mow the lawn and he would let those clipping[s] get into the drive area and then just let the rain wash it down into the docks, so there was a lot of biomaterial there mixing with the dirt and then all that rain. And, like I said, at that time, you could see greenish growth growing in that, almost like an oil slick and grease, so that's why I call [the puddle's contents] slime.

(Doc. 45-1, p. 62). Cox corroborated some of this assessment, noting that the ramp would sometimes "hold some water because there will be some dirt and debris there that will stay moist." (Doc. 45-8, p. 23). Cox described the dirt and debris as "stuff that gets off trailers, the tires and stuff from backing up and pulling out from—coming off the road. Just little by little, it adds up[.]" *Id.*

According to Powell, "[s]ometimes not-so-nice truck drivers that had delivered [to WestRock] would sweep out their trailers, and it would get on the—it would drop down into the dock." *Id.* at 61. However, Powell said that WestRock employees did not tolerate this behavior and made any drivers caught in the act pick up their mess. *Id.* at 64. WestRock's shipping manager, Norman Flurry, confirmed this, saying that "at times" there was an issue with drivers sweeping out their trailers in the loading area and that the drivers were "not allowed to do it . . . . [b]ecause it makes a mess in the [ramp]." (Doc. 45-2, p. 41). Flurry also said that "[w]e try to

4

catch them.  If we ever catch them, we make them pick it up."  *Id.*  He stated that there was "[n]ot necessarily a policy" about this, but that "everybody just kind of watches" for it.  *Id.* at 42.  Danny Murphy, another WestRock employee, testified similarly about this behavior: "If we caught them, we made them clean it up."  (Doc. 45-6, p. 42).

Koontz was also familiar with these unauthorized sweepouts, saying: "Usually we have a lot of over-the-road guys come in and they'll sweep their trailers out in those docks and if drivers don't go and pick it up, it will just lay there."  (Doc. 45-7, p. 23).  Koontz said that the Diamondback drivers at WestRock tried to pick up their own messes instead of "waiting on somebody else to come and do it," even though maintenance of the loading area was not in their job descriptions.  *Id.* at 23–24.  Koontz indicated that WestRock had a policy requiring trailers to be swept out between loads in a designated area, but that the policy was seldom followed or enforced because most drivers "take care of it."  *Id.* at 25.  Generally, Koontz said, drivers do not pick up other drivers' messes.  *Id.* at 26.  However, Koontz said he did not observe materials remaining in the docks or on the ramp for prolonged periods of time.  *Id.* at 27, 56.

Another possible source of the puddle's contents was a nearby construction project.  Flurry testified that the City of Fort Smith had been "doing some construction out by the road" near the Facility.  (Doc. 45-2, pp. 39–40).  Specifically, the City was "working on some water lines and they would pump the water out of the hole out into our parking lot."  *Id.* at 40.  This resulted in "[w]ater and mud" settling on the ramp near the docks.  *Id.*  The City refused to route the drainage in a different direction, but they would send cleaning crews to clear the drainage off of the ramp at WestRock's request.  *Id.* at 43.  Per Flurry, "[e]very time they done it, we had them to clean it up. . . . We had the [C]ity to come out and clean it."  *Id.* at 43.  Murphy testified that the pump-outs "were happening daily" for a period of time, and that the City's contractor only cleaned the

ramp "a couple times." (Doc. 45-6, p. 39). Murphy said that the muddy runoff from the City's pump-outs "ran underneath the trailers." *Id.* at 40. Cox, by contrast, said that he "never saw anything that [the construction workers] did come down into the ramp." (Doc. 45-8, p. 24). Recollections also vary as to the last time that the city cleaned the ramp: Powell testified that "that had all been finished" and the city had already "come and cleaned that little mess up" by the time Powell fell. (Doc. 45-1, p. 60). Koontz testified that the runoff was not cleaned up until after Powell's fall. (Doc. 45-7, p. 30). Cox recalled that the city cleaned the ramp off with "some big water hoses like firemen have," but could not recall whether this took place before or after Powell's fall. (Doc. 45-8, pp. 24–25).

Powell alerted WestRock to the poor conditions on the ramp: "I have a bad right knee, so . . . my whole issue while I was slipping around, I was yelling at them constantly about the condition of the docks because I kept having those slips[.]" (Doc. 45-1, pp. 57–58). Specifically, Powell complained to Flurry on several occasions, "and then the final time shortly before my fall I insisted on telling the safety person directly, and I don't know his name." *Id.* at 85. Powell said that a WestRock employee named James was also "aware of it." *Id.* Powell believed that a coworker, Jason Koontz, had also complained to WestRock about the puddle. *Id.* at 72. Powell also overheard other drivers complaining about the slippery conditions, although he did not specify whether the complaints were directed to WestRock employees. *Id.* Koontz confirmed that Powell had complained "a couple of times" about the ramp being slippery, which Koontz attributed to the City's muddy runoff. (Doc. 45-7, p. 29). Koontz denied making any complaints himself. *Id.* at 57.

Besides complaining to WestRock, Powell took extra precautions to prevent himself from slipping. He acquired some non-slip "booties" to wear in wet conditions. (Doc. 45-1, p. 42). He

also "started duckwalking every time it was wet surfaces just because I do not want to slip." *Id.* at 73.

There is some evidence that WestRock made efforts to keep the loading area clean. Flurry testified that WestRock personnel would periodically "audit" the ramp to "make sure it's clean." (Doc. 45-2, p. 42). Flurry himself claimed to "walk through [and] make sure the parking lot is clean . . . about every day." *Id.* Koontz said that the areas of ramp in between the docks were cleaned "usually every two to three months." (Doc. 45-7, p. 26). As for the live grass in the puddle, Murphy testified that grass removal was "just . . . part of cleaning" the parking lot and that the task fell to "[w]hoever was told to go do it." (Doc. 45-6, p. 59).

On the day of Mr. Powell's injury, it had been raining for roughly a week. (Doc. 45-1, p. 57). Powell was not a stranger to performing his job duties at the WestRock facility in "[s]now, ice, extreme heat, rain[,]" and "the whole gamut" of inclement weather. *Id.* On this particular day, however, "conditions were just really bad in the docks. It was just very slippery[.]" *Id.* Accordingly, Powell had "been duckwalking at just about all the docks because [of] all the wet rain" and "just [went] real careful." *Id.* at 70. Powell stated that most of the docks were "kind of pretty muddy" on that day, but that he was able to successfully navigate them by duckwalking. *Id.* at 74. The puddle area, however, "was worse. The other [dock he worked in that day] was just kind of muddy and watery, but that one [with the puddle] in particular was the worst." *Id.* at 73. Powell attributes this to the fact that "those [other docks] didn't have the slime . . . growing in them." *Id.* at 74.

After Powell delivered several loads without incident, Flurry told Powell to pick up a trailer from one of the docks that was partially covered by the puddle. (Doc. 45-1, p. 58). Powell backed his tractor up to the trailer, examined the area for obstacles, and then got out and stepped under the

trailer to inspect it.  *Id.*  He then duckwalked over to the chock that held the rear tires in place, which entailed navigating the puddle.  *Id.* at 58–59; *see* Doc. 33-2.  Powell moved "a little bit more careful[ly]" than he had in the other wet areas "because I wasn't sure exactly how slippery that [puddle] would be."  (Doc. 45-1, p. 71).

Because of the rain, the puddle extended to within "a foot [or] two feet" from the rear tires.  (Doc. 45-1, p. 71).  Despite this, Powell was able to reach the chock and pull it out.  *Id.* at 59.  Then, in his words: "I remember turning around, and I just—it's like a cartoon.  It's like my feet went up and I went grabbing for the trailer and there was nothing there to grab . . . . I landed just smack on the straight of my back." *Id.*

Powell was transported by ambulance to the hospital.  (Doc. 45-1, p. 60).  Koontz ultimately delivered the load that Powell was preparing to deliver before his fall.  (Doc. 45-7, p. 20).  Koontz had to cross through the puddle to close the doors on the trailer before delivering the load.  *Id.* at 37.

Powell ultimately required spinal surgery to repair the damage caused by the fall.  (Doc. 45-1, p. 88).  Since the injury, he has experienced constant pain as well as neurological symptoms and impaired coordination.  *Id.*, *id.* at 107–09.  Powell now brings this suit against WestRock, alleging failure to maintain the premises, failure to warn, negligent supervision, negligent hiring, negligent training, and "other direct liability claims of negligence."  *See* Doc. 14.  Powell also seeks punitive damages.  *Id.*

## II.   Legal Standard

On a motion for summary judgment, the moving party has the burden to show that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Facts are material when they can "affect the outcome of the suit under the governing

law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes are genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "[A] nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quotations omitted). The record must be construed in the nonmovant's favor, with "the 'benefit of all reasonable inferences in the record.'" *Schottel*, 42 F.4th at 981 (quotation omitted).

### III.    Analysis

WestRock opposes all of Powell's claims. First, WestRock argues that it owed Powell no duty to maintain the premises or warn of dangerous conditions due to Powell's status as an independent contractor. Second, WestRock says that Powell's claims related to WestRock's employees must fail because Powell fails to name the employee responsible. Finally, WestRock claims that the facts of this case do not warrant punitive damages. The Court will address these arguments in turn.

#### a.   *Failure to Maintain/Failure to Warn*

To demonstrate negligence under Arkansas law, "the plaintiff must show that the defendant breached a legal duty to the plaintiff, and that the breach proximately caused the plaintiff harm." *Edwards v. Skylift, Inc.*, 39 F.4th 1025, 1029–30 (8th Cir. 2022). The Court finds that Mr. Powell has raised a fact question as to whether WestRock was negligent in failing to maintain the ramp.

##### 1.   Duty

WestRock argues that it did not owe Mr. Powell a duty with regard to the condition of its ramp. The Court disagrees.

In Arkansas, "[t]he general rule is that an employer does not have a duty to provide a reasonably safe work environment for the employees of its independent contractor." *Duran v. Sw. Ark. Elec. Coop. Corp.*, 537 S.W.3d 722, 728 (Ark. 2018). However, a business "owes a common-law duty to the independent contractor's employees to exercise ordinary care for their safety and to warn against any hidden dangers or unusually hazardous conditions." *Id.* at 727. "The duties of an employer to the employees of an independent contractor are analogous to those a premises owner owes a business invitee." *Id.* at 728. And while a premises owner's duty to an invitee is usually "satisfied when the danger is either known or obvious to the invitee[,]" "an owner may continue to owe a duty of care to a business invitee who is forced, as a practical matter, to encounter a known or obvious risk to perform his or her job." *Id.*

The question before this Court is whether an independent contractor "forced to encounter a known or obvious risk" is owed a duty of care in the same way as a business invitee would be, or whether such a duty of care would amount to "a duty to provide a reasonably safe work environment" for the contractor's employees, a duty which employers do not have under Arkansas law. The Arkansas Supreme Court raised this question in *Duran* but declined to reach it on the facts of that case. Powell has asked this Court to certify the question to the Arkansas Supreme Court, but this Court does not believe that there is a need to do so.[2]

"If [a state] Supreme Court has not spoken on a particular issue," a federal court applying that state's law "must attempt to predict how the [state] Supreme Court would decide an issue and may consider relevant state precedent, *analogous decisions*, considered dicta . . . and any other reliable data." *Integrity Floorcovering, Inc. v. Broan-Nutone, LLC*, 521 F.3d 914, 917 (8th Cir.

---

[2] For this reason, Powell's motion to certify this question to the Arkansas Supreme Court is denied.

2008) (emphasis added) (internal quotations omitted).   Here, the Arkansas Supreme Court has already stated that the duties owed to an independent contractor's employee are analogous to those owed to a business invitee.   It has further stated that a premises owner may have a duty of care to business invitees forced to encounter known or obvious risks to perform their jobs.   This Court therefore predicts that the Arkansas Supreme Court would recognize a duty of care owed to an independent contractor's employee where the employee is forced to encounter a known or obvious risk to perform his or her job.[3]

WestRock resists this conclusion by pointing to the tension between such a rule and the lack of a duty to provide a "reasonably safe work environment."   However, the duty under the forced-encounter rule is a comparatively narrow one.   It does not obligate an employer to rid its premises of all hazards, only those which invitees cannot avoid.   Further, in Arkansas, the duty of care owed to an independent contractor's employee takes into account any "danger inhering in the operation."   *Aluminum Ore Co. v. George*, 186 S.W.2d 656, 659 (Ark. 1945).   In other words, an employer is not liable when the unavoidable hazard is baked into the job itself.   Illustratively, in *Culhane v. Oxford Ridge, LLC*, 362 S.W.3d 325 (Ark. Ct. App. 2009), a contractor was struck by an oncoming vehicle while working on a subdivision entrance that abutted a highway.   *Id.* at 326.   The Arkansas Court of Appeals held that the contractor's estate could not recover under a forced-encounter theory because the nearby oncoming traffic was "an obvious hazard integral to the work that he was hired to perform[.]"   *Id.* at 330.   Accordingly, because the forced-encounter rule does

---

[3] WestRock contends that because Powell did not claim to be an invitee in his complaint, he may not rely on the rule for invitees to avoid summary judgment.   However, the Court has concluded here that the same duty applies to the employees of independent contractors by virtue of the duties being analogous.

not create a duty to mitigate avoidable hazards or hazards inherent in the work, it is a far cry from a broad-based duty to provide a "reasonably safe work environment."

To the extent that WestRock contends that the lack of a duty to provide a safe work environment precludes *any* duty on the part of the employer to remedy *any* hazard in the contractor's work area, such a rule would almost completely vitiate the employer's duty of ordinary care for the contractor's employees' safety.  Further, other jurisdictions which do not recognize a duty to provide a safe work environment for a contractor's employees still allow premises liability for employers in some circumstances.  In Indiana, for example, while "an owner of property is under no duty to provide an independent contractor with a safe place to work[,]" "a property owner must maintain its property in a reasonably safe condition for business invitees, including employees of independent contractors."  *Podemski v. Praxair, Inc.*, 87 N.E.3d 540, 547 (Ind. Ct. App. 2017).  In Louisiana, "a principal ordinarily owes its independent contractor no duty . . . to provide a safe place to work.  But the no-duty rule does not apply when the principal either affirmatively assumes the duty or creates a workplace hazard."  *Parkman v. W&T Offshore, Inc.*, 673 F. Supp. 3d 811, 823 (M.D. La. 2023) (internal quotations and alterations omitted).  And Florida, which has a general rule against *any* liability of a property owner for the on-the-job injury of an independent contractor's employee, makes a specific exception when "the property owner negligently creates or negligently approves a dangerous condition."  *Williams v. Weaver*, 381 So. 3d 1260, 1264 (Fla. Dist. Ct. App. 2024).  The duty this Court now recognizes, to remedy open and obvious hazards that are neither avoidable by the employee nor inherent in the work for which the employer contracted, is as compatible as any of the above rules with the general lack of a duty to provide a safe work environment.

    2.  <u>Breach of Duty</u>

Having established WestRock's duty to Mr. Powell under the forced-encounter rule, the Court now turns to whether the facts of this case could support a finding that WestRock breached that duty.

The leading Arkansas forced-encounter case is *Carton v. Mo. Pac. R.R. Co.,* 798 S.W.2d 674 (Ark. 1990). The plaintiff in that case was a trucker tasked with unloading diesel fuel at a railroad terminal. *Id.* at 675. In order to unload her truck, "she had to walk across a surface which 'was dirty, messy, [and] greasy'" and she testified that diesel "spillage would accumulate and sit there." *Id.* Some spillage inevitably resulted from the diesel unloading process, but some truckers purposefully drained their hoses onto the gravel surface. *Id.* at 676. The railroad, which owned the property, only changed the gravel out twice in a seven-year period. *Id.* One day, the trucker had to walk through the greasy gravel into her truck. *Id.* at 675. When she stepped back out of her truck, the oil on her shoes caused her to slip and fall. *Id.* The Arkansas Supreme Court held that because there were ways in which the railroad could have reduced spillage, cleaned the surface, or otherwise made the surface safer, a jury could find that the railroad had breached its duty to the trucker. *Id.* at 676–77.

Here, taking the facts in the light most favorable to Mr. Powell, the situation is nearly identical. Powell was a truck driver forced to encounter a slick substance in order to perform his job. The photographic evidence shows that the puddle contained mud, chunks of unknown material, and a tall and healthy bunch of grass at the time of Powell's fall, indicating that the area had not been cleaned for some time. Indeed, the testimony of other workers indicates that the area would go months between thorough cleanings. Taken together, this evidence is on all fours with the facts of *Carton*, meaning that a jury could find here that WestRock breached its duty to Powell.

WestRock resists this conclusion by arguing that the risk of slipping in a puddle or on a wet surface is inherent in a truck driver's job. While this may be true, Powell testified that most other puddles he has encountered in his many years on the job contained only water, while this puddle contained additional material which made it more slippery. Further, on the day of his fall, Powell was already taking precautions against the rain by duckwalking and wearing booties. The fact that these precautions proved sufficient on other wet surfaces, but not in this puddle, could reasonably be viewed as evidence that the puddle was slipperier or otherwise more hazardous than the wet surfaces commonly encountered by truck drivers. Given this, a reasonable jury could conclude that the puddle was not the kind of hazard inherent in the work Powell was hired to perform. For the foregoing reasons, the Court finds that Powell has raised a question of material fact as to whether WestRock breached the duty it owed to him.

Because WestRock did not present argument as to the third element of negligence, causation of harm, the Court need not consider it. Accordingly, summary judgment on Mr. Powell's negligence claim will be denied.

### b. Negligent Hiring, Retention, Supervision, and Training

WestRock argues that Powell's claims against WestRock for negligent hiring, retention, supervision, and training must be dismissed because Powell failed to name the employee responsible. The Court agrees in part.

WestRock appears to argue that because the employer-employee relationship is the basis for Powell's claims, and because an employee is not subject to premises liability unless given entire control of the land at issue (*MIC v. Barrett*, 855 S.W.2d 326, 329 (Ark. 1993)), WestRock cannot be subject to liability for its employees' actions unless Powell names the employee responsible and demonstrates that WestRock turned over control of the Facility to that employee.

14

However, negligent hiring, retention, supervision, and training are "independent actionable negligence on the part of the employer" for which the employer "may be held liable even though the employee is found to have been free from fault." *Med. Assurance Co. v. Castro*, 302 S.W.3d 592, 597 (Ark. 2012) (quoting *Chi., Rock Island & Pac. R.R. Co. v. Davis*, 397 S.W.2d 360, 361 (Ark. 1965)) (emphasis deleted). Because independent liability on the part of the responsible employee is not necessary to show negligent hiring, supervision, or training, Powell's failure to show that one of WestRock's employees had been given complete control of the Facility is of no moment.

The fact that Powell has failed to name the responsible employee bars his claim for negligent hiring, however, albeit for a different reason. To prove negligent hiring, "the plaintiff must show (1) that an inadequate background check was done or that there was the complete absence of a background check [and] (2) that a proper background check would have revealed that the employee was not qualified for the position for which he or she was hired[.]"[4] *Paulino v. QHG of Springdale, Inc.*, 386 S.W.3d 462, 469 (Ark. 2012). Here, Powell has made no showing of any kind with regards to a background check or an employee's qualifications. Accordingly, he has not raised a question of material fact as to negligent hiring, and summary judgment is proper on this claim.

The torts of negligent supervision and negligent retention require "proof that the employer knew or, through the exercise of ordinary care, should have known that the employee's conduct would subject third parties to an unreasonable risk of harm." *Saine v. Comcast Cablevision of Ark.*, 126 S.W.3d 339, 342 (Ark. 2003). "As with any other negligence claim, a plaintiff must

---

[4] This test has a third factor which applies only to claims based on criminal acts by the employee.

show that the employer's negligent supervision or negligent retention of the employee was a proximate cause of the injury and that the harm to third parties was foreseeable." *Id.* Here, Powell points to two pieces of evidence that employees were being negligently supervised or retained: the fact that WestRock's regular maintenance did not involve removing water, mud, or gravel from the ramp; and the presence of tall grass on the ramp near the puddle despite grass removal being part of WestRock's regular maintenance.

From these facts, and from the condition of the ramp itself, Powell argues that the Court may infer negligent supervision and retention on the part of WestRock.  However, deficiencies in WestRock's maintenance policy do not imply employee misconduct as required to sustain the cause of action.  And while the failure to remove the grass may indicate that employees were not being adequately supervised, Powell does not allege that the live grass itself caused the fall. Presumably, Powell would have the Court infer that WestRock's observation of the grass should have tipped WestRock off that employees were not cleaning the ramp properly, and that closer supervision or termination of the employees responsible would have ensured a clean and safe ramp. However, generally speaking, Powell has presented no facts which would show that the puddle resulted from employees failing to do their jobs as opposed to WestRock's own inadequate maintenance policies.  *Cf. Cowan v. Ellison Enters.*, 217 S.W.3d 175, 181 (Ark. Ct. App. 2005) (en banc) (affirming summary judgment where plaintiff "never presented facts showing that the grape upon which she slipped fell to the floor as a result of [the allegedly negligent] conditions").

With that being said, Powell has presented evidence of one specific instance of an employee being improperly supervised or retained: Glen, the maintenance man.  Powell testified that Glen would allow grass clippings to accumulate on the ramp after mowing the lawn and that these clippings would wash into the puddle and break down, contributing to the slime Powell

16

slipped in.  Considering the evidence in the light most favorable to Powell, a reasonable jury could find that WestRock should have known the grass clippings would degrade and create slippery conditions, and therefore should have directed Glen to do his job more carefully or replaced him with a more conscientious maintenance person.  Accordingly, Powell's claims of negligent supervision and retention survive summary judgment as to the supervision and retention of Glen alone.

The tort of negligent training, to the Court's knowledge, has never been elaborated upon by an Arkansas court.  The two decisions that have come closest are *Russell v. Northeast Texas Land and Timber Co.*, 372 S.W. 3d 816 (Ark. Ct. App. 2009), and *Kristie's Katering, Inc. v. Ameri*, 35 S.W.3d 807 (Ark. Ct. App. 2001).  In *Russell*, the Arkansas Court of Appeals treated the plaintiff's claims of negligent entrustment, hiring, training, and/or supervision as a unitary "direct liability" claim.  372 S.W.3d at 818.  It upheld dismissal of this unitary claim because the plaintiff had not shown the employer's prior knowledge of the employee's negligent character.  *Id.*  In *Kristie's*, the plaintiff claimed that the defendant "was negligent in failing to monitor, properly train, or supervise its security force." 35 S.W.3d at 812.  The Court of Appeals held that "evidence that Kristie's owner provided no formal training, no training manuals, materials or workbooks, and that there existed no written rules or regulations governing the conduct of security guards in ejecting patrons" was evidence of negligent *supervision*, but did not mention a separate tort of negligent training.  *Id.* at 813.  From this, the Court gathers that a claim for negligent training in Arkansas overlaps with a claim for negligent supervision.[5]  Accordingly, Powell's negligent training claim survives only as to Glen.

---

[5] This is not as unusual as it may seem—several other jurisdictions treat negligent training and negligent supervision as the same tort.  *See, e.g., Evans v. Hawes*, --- F. Supp. 3d ----, 2024 WL 810886, at *15 (D. Nev. Feb. 26, 2024) (Nevada law); *Doe v. Brandeis Univ.*, --- F. Supp. 3d

*c. Punitive Damages*

WestRock says this case is not appropriate for punitive damages.  Even taking the facts in the light most favorable to Powell, the Court agrees.

"Punitive damages are 'not a favorite of the law' in Arkansas." *Morris v. Union Pac. R.R.*, 373 F.3d 896, 903 (8th Cir. 2004) (quoting *Diamond Shamrock Corp. v. Phillips*, 511 S.W.2d 160, 164 (Ark. 1974)).  Under Arkansas law, "an award of punitive damages is justified only where the evidence indicates that the defendant acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred." *McCoy v. Montgomery*, 259 S.W.3d 430, 435 (Ark. 2007).  In a negligence case, "it must appear that the negligent party knew, or had reason to believe, that his act of negligence was about to inflict injury, and that he continued in his course with a conscious indifference to the consequences, from which malice may be inferred." *Id.*  This requires more than "[g]ross dereliction of duty" standing alone. *Orsini v. Larry Moyer Trucking, Inc.*, 833 S.W.2d 366, 368 (Ark. 1992).  A plaintiff must be able to satisfy this standard by clear and convincing evidence. *Curtis Lumber Co. v. Louisiana Pac. Corp.*, 618 F.3d 762, 785 (8th Cir. 2010).

To give the reader a better idea of how this standard operates in practice, below are some Arkansas negligence cases in which an award of punitive damages has been upheld:

- The heirs of an elderly woman with dementia sued her nursing home after she died of severe malnutrition and dehydration.  The nursing home was chronically short-staffed, but it falsified records to give the appearance of adequate staffing and care to state regulators.  In fact, there were sometimes not enough staff to feed the woman (who could not feed

----

----, 2024 WL 733330, at *7 (D. Mass. Feb. 22, 2024) (Massachusetts law); *Motley v. Express Servs., Inc.*, --- So. 3d ----, 2023 WL 4141641, at *3 (Ala. 2023).

herself) or give her water.  She lost fifteen pounds in the month before her death.  During her stay, the woman was frequently found lying in her own urine and excrement.  At one point, she had an open pressure sore the size of a softball.  The Arkansas Supreme Court affirmed an award of punitive damages against the nursing home.  *Advocat, Inc. v. Sauer*, 111 S.W.3d 346 (Ark. 2003); *see also Rose Care, Inc. v. Ross*, 209 S.W.3d 393, 407 (Ark. Ct. App. 2005) (reversing directed verdict of no punitive damages under similar facts).

- A logging truck, carrying a trailer "piggyback" and traveling on a highway, crossed into the oncoming lane and struck a car head-on.  The car's driver and his young daughter died, and the other two passengers were seriously injured.  A lawsuit was brought against the truck driver's employer.  Investigation revealed that the truck driver was speeding and had a five-year record of citations for speeding and operating defective equipment. Within the two weeks before the accident, the truck driver had told his employer that the truck was in poor condition and should not have been on the road because the brakes were not working properly.  In fact, in order to avoid expensive maintenance, one of the brakes had been deliberately disabled.  An expert testified that nobody who inspected the truck would have thought it was in acceptable condition to drive.  The Arkansas Supreme Court upheld an award of punitive damages.  *D'Arbonne Const. Co. v. Foster*, 123 S.W.3d 894 (Ark. 2003).

- A garbage truck was struck by a freight train while crossing a railroad track, killing the driver and injuring a passenger.  The railroad had allowed vegetation to grow up around the tracks at that crossing, preventing oncoming vehicles from seeing approaching trains, and had ignored multiple complaints about the vegetation.  The year before the crash, the railroad had entered into a contract to clear the vegetation, but it allotted no money to the contract.  There had been several near misses at the crossing prior to the deadly collision,

and many local residents had called the railroad to complain. The railroad spoliated evidence by prematurely discarding communications and documents relating to the condition of the track. It was later discovered that another railroad, which had previously owned the tracks, had put "slow orders" in place to reduce the speed at which trains traveled through the crossing, but that the current railroad had discontinued that practice and allowed trains to travel through the crossing at 60 miles per hour. The Arkansas Supreme Court held that a jury could have properly concluded that the railroad knew or should have known that the combination of overgrown vegetation and full-speed trains would naturally or probably result in injury, but allowed the conditions to persist anyway. *Union Pac. R.R. Co. v. Barber*, 149 S.W.3d 325 (Ark. 2004).

By contrast, in the following cases, punitive damages were held *not* to be warranted under Arkansas law:

- A train collided with a truck towing two trailers, then came to a stop. Nobody was hurt, but the truck's trailers ended up on opposite sides of the tracks quite close to the train cars. A crowd gathered to look at the wreck. A tow-truck driver was called in to haul the trailers out of the road. While the tow-truck driver inspected one trailer close to the train, the train abruptly started moving. A protrusion on the side of the train pushed the tow-truck driver through the inches-wide gap between the trailer and the train, causing severe injuries. Applying Arkansas law, the Eighth Circuit reversed an award of punitive damages. Even though the railroad had been negligent in moving the train with many bystanders in the area, there was no evidence that the crew was consciously indifferent to the possibility of a bystander being injured. Indeed, the crew made some (inadequate) efforts to protect people in the area: they kept a lookout on one side of the train, obtained assistance from

20

law enforcement to warn onlookers away from the scene, and did an incomplete survey of the landscape before starting the train.  Additionally, there was no evidence that the crew was aware of the protrusion or that any specific party was in imminent danger.  *Morris*, 373 F.3d at 904.

- A power company failed to implement any kind of inspection program for its lines and poles.  When a motorist crashed into a pole one night, causing a power outage, the two power company employees dispatched to the scene decided to turn the power back on. They did not report the damage from the crash to their superior until the next morning, and the superior did not arrange for the pole to be fixed until noon.  In the meantime, the impacted pole's displacement caused its live wire to gradually sag and drop onto a fence, electrifying the fence and causing a fire.  The Arkansas Supreme Court affirmed a directed verdict for the power company on the punitive damages issue, stating that there was no evidence of conscious indifference to consequences such as would be required to find malice.  *Carroll Elec. Co-op. Corp. v. Carlton*, 892 S.W.2d 496 (Ark. 1995), *overruled on other grounds by Hartford Fire Ins. Co. v. Sauer*, 186 S.W.3d 229 (Ark. 2004).

- Between 1979 and 1980, four customers notified a manufacturer that they had been injured by its product.  The manufacturer did not respond until 1981, when it began placing warning decals on its products and sending the decals out to customers who had bought older versions of the product.  Around the same time, the manufacturer developed a safer product design, which it began to incorporate into its new products beginning in 1982.  In the meantime, the manufacturer received notice of two more injuries.  In 1984, the manufacturer began retrofitting its old products with the new, safer component.  Between 1982 and 1984, 10 more people were injured by the original defect.  One of these last 10

sued.  Applying Arkansas law, the Eighth Circuit held that the delayed response to the reports may have been negligent, but there was no evidence of willfulness or malice on the part of the manufacturer.  Accordingly, the Eighth Circuit affirmed a directed verdict for the manufacturer on the punitive damages issue.  *Lockley v. Deere & Co.*, 933 F.2d 1378 (8th Cir. 1991).

The facts of the present case, even viewed in the light most favorable to Mr. Powell, tally closely with cases in which punitive damages were held not to be available.  The evidence shows that WestRock made some efforts and implemented some policies to keep the ramp clean, even if those ultimately proved inadequate.  WestRock convinced the city to wash its muddy runoff off of the ramp, tried to prevent drivers from sweeping out their trucks onto the ramp, and may also have cleaned the ramp itself on occasion.  These precautions indicate that WestRock was not consciously indifferent to the safety of those using the ramp.

It is true that WestRock allegedly received several complaints about previous "slips" without taking action.  However, there is no evidence that any of those slips resulted in falls before Mr. Powell's injury, which occurred after a week of rain had enhanced the size and spread of the hazardous puddle.  And in any event, allowing a slippery puddle to persist does not create the great and imminent risk of harm necessary for the knowledge that negligent conduct is "about to inflict injury."  A slimy puddle is less certain to injure an experienced trucker than neglect and starvation are to injure a helpless elderly woman.  One cannot compare the odds of an eventual injurious fall at an obviously slippery spot to the risk of an accident at a sixty-mile-per-hour railroad crossing with no visibility.  And the Court has no doubt that if asked to choose between tracking through the puddle at issue here and sharing the road with a ramshackle truck with a disabled brake which is driving over the speed limit while hauling a second truck behind it, most truckers would opt to

22

duck-walk their way across the Facility's ramp.  The mere fact that WestRock had notice of the problem and failed to adequately correct it, while probative of negligence, cannot by itself constitute the malice needed for punitive damages.  Otherwise, this disfavored remedy would be available in nearly every case of premises liability, a result which the Arkansas cases do not bear out.

The Court finds that no reasonable jury could find conscious indifference to imminent injury by clear and convincing evidence on these facts.  Therefore, Mr. Powell's claim for punitive damages will be dismissed.

## IV.   Conclusion

IT IS THEREFORE ORDERED that Defendant WestRock CP, LLC's motion for summary judgment (Doc. 33) is GRANTED IN PART AND DENIED IN PART.  Mr. Powell's premises-liability claim remains for trial, as do his claims for negligent supervision, retention, and training of Glen the maintenance man.  Mr. Powell's other negligence claims and his claim for punitive damages are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Mr. Powell's motion to certify (Doc. 48) is DENIED.

IT IS SO ORDERED this 20th day of June, 2024.

/s/ P. K. Holmes, III

P.K. HOLMES, III
U.S. DISTRICT JUDGE